**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SANTIAGO GUZMAN, Individually and On Behalf of All Others Similarly Situated, | **CIVIL ACTION NO. 06-cv-06235** |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | |
| IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, and FRANCIS T. JOYCE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Santiago Guzman, ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding IMAX Corporation ("IMAX" or the "Company") securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers of the common stock of IMAX between February 17, 2006 and August 9, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. IMAX is one of the world's leading entertainment technology companies and the newest distribution window for Hollywood films.

3. The complaint alleges that, throughout the Class Period, defendants failed to disclose: (1) that defendants improperly timed revenue recognition from theatres; (2) specifically, that the Company recognized revenue in the fourth quarter of 2005 from at least ten theatres before the theatres had opened; (3) that the Company sought to manipulate its financial results because it desired to attract entities interested in buying or merging with the Company; (4) that the Company's financial statements were materially inflated; (5) that the Company lacked adequate internal controls; and (6) that the Company's financial statements were presented in violation of Generally Accepted Accounting Principles ("GAAP").

4. On August 9, 2006, after the market closed, IMAX shocked investors when the Company announced that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems.

5. On this news, shares of IMAX plummeted $3.90, or 40.5 percent, to close, on August 10, 2006, at $5.73 per share, on unusually heavy trading volume.

**JURISDICTION AND VENUE**

6. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading

information, occurred in substantial part in this Judicial District. Pursuant to 28 U.S.C. § 1391(d), as an alien corporation, IMAX may properly be sued in any District in the United States, including the Southern District of New York. Moreover, IMAX trades its shares on NASDAQ, which is located in the Southern District of New York. Thus, venue is proper in this District.

9. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10. Plaintiff, Santiago Guzman, as set forth in the accompanying certification, incorporated by reference herein, purchased IMAX common stock at artificially inflated prices during the Class Period and has been damaged thereby.

11. Defendant IMAX is a Canadian corporation with its principal place of business located at 2525 Speakman Drive, Mississauga, Ontario, Canada, L5K 1B1.

12. Defendant Richard L. Gelfond ("Gelfond") was, at all relevant times, the Company's Co-Chairman and Co-Chief Executive Officer.

13. Defendant Bradley J. Wechsler ("Wechsler") was, at all relevant times, the Company's Co-Chairman and Co-Chief Executive Officer.

14. Defendant Francis T. Joyce ("Joyce") was, at all relevant times, the Company's Chief Financial Officer.

15. Defendants Gelfond, Wechsler, and Joyce are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the

Company, possessed the power and authority to control the contents of IMAX's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

16. IMAX is one of the world's leading entertainment technology companies and the newest distribution window for Hollywood films.

### Materially False and Misleading Statements Issued During the Class Period

17. The Class Period commences on February 17, 2006. At that time, IMAX announced that the Company expected to meet or exceed its full year 2005 financial guidance. Specifically, the Company stated:

> IMAX Corp. announced today that, reflecting the strong tone and momentum of its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35 to $0.38 in net earnings per share on a fully diluted basis.
>
> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year

> versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $145 to $150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records.
>
> "IMAX's momentum and growth potential is building," said IMAX Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."
>
> IMAX also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.
>
> "In addition to delivering on our financial and operational goals, we continued to deliver on our strategy of positioning IMAX as a profitable release window for Hollywood films, providing the Company with a strong platform from which to fulfill its long term potential," Gelfond and Wechsler continued. "We are very excited to enter 2006 with our strongest film slate ever, with five IMAX DMR(R) titles already secured for day and date release, and Deep Sea 3D set for release in March. With the probable addition of another title in the fourth quarter of 2006 we expect to have a film release every six to eight weeks in 2006, which, we believe, should be a major factor in driving theatre sales as well as recurring revenues."
>
> IMAX will release its fourth quarter and 2005 full year financial results pre-market on Thursday, March 9, 2006.

18. On March 9, 2006, IMAX announced financial results for the year ended December 31, 2005. The Company reported that it had exceeded guidance and expectations for 2005, with net earnings of $0.40 per share, versus guidance of $0.35-$0.38 per share. The

Company's 2005 net earnings represented a 62 percent increase when compared to earnings of $0.26 per diluted share reported for the year ended December 31, 2004. Commenting on these results, defendants Gelfond and Wechsler stated:

> Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow. We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment. We believe our steadily improving financial performance shows that our strategy and The IMAX Experience have been embraced by consumers, major studios and leading film exhibitors around the world.

19. Also on March 9, 2006, IMAX filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. The Company's Form 10-K also contained the following Sarbanes-Oxley required certifications signed by the Individual Defendants:

> 1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;
>
> 2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

(d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

SECTION 906 CERTIFICATION

The Annual Report on Form 10-K for the fiscal year ended December 31, 2005 (the "Form 10-K") of the Company fully

> complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

20. Also on March 9, 2006, IMAX announced that the Company would explore "strategic alternatives to enhance shareholder value," including the potential sale or merger of the Company. Specifically, the Company stated:

> IMAX Corporation today announced that its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business with another entity offering strategic opportunities for growth. The company has retained Allen & Company and UBS Investment Bank as financial advisors in this process.
>
> "In order to fully realize the growth potential inherent in both the IMAX brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options," said IMAX Co-Chairmen and Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.
>
> In making the announcement, IMAX stated that there can be no assurance that the exploration of strategic alternatives will result in a transaction. The Company does not currently intend to disclose developments with respect to the exploration of strategic alternatives unless and until its Board of Directors has approved a specific transaction.

21. On May 9, 2006, IMAX announced financial results for the first quarter of 2006, ended March 31, 2006. The Company reported a net loss of $0.14 per diluted share for the quarter, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. Commenting on these results, defendants Gelfond and Wechsler stated:

> We are pleased that we remain on track to grow IMAX's signings and installations - the two most important metrics of our growth - in 2006 above our exceptionally strong 2005 results. Given our solid film slate and the large amount of interest we are seeing from commercial exhibitors, we believe the Company will benefit from significant momentum as we look to the remainder of the year. First quarter earnings were below guidance of approximately a ten cent loss due to a number of factors, including the underperformance of V for Vendetta, which reduced earnings by two cents, the increase in non-cash compensation related to the increase in stock price after the Company's announcement of its exploration of strategic alternatives including the potential sale of the Company, which reduced earnings by one cent, as well as other non-cash expenses relating to this sale process incurred in the quarter. That said, we continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly.

22. Additionally, and with respect to the potential sale or merger of IMAX, defendants Gelfond and Wechsler stated:

> We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. We remain confident that pursuing strategic alternatives for the business will enable us to expand the company's scale, accelerate its growth and enhance shareholder value.

23. Also on May 9, 2006, IMAX filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Joyce and reaffirmed the Company's previously announced financial results. With respect to the presentation of its financial results, the Company stated: "In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations."

24. Additionally, the Company's Form 10-Q contained the following Sarbanes-Oxley required certifications signed by the Individual Defendants:

1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.
>
> ***
>
> SECTION 906 CERTIFICATION
>
> The Quarterly Report on Form 10-Q for the quarter ended March 31, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

25. On August 9, 2006, IMAX announced financial results for the second quarter of 2006, ended June 20, 2006. The Company reported net earnings of $0.08 per diluted share for the quarter ended June 30, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended June 30, 2005. Commenting on these results, defendants Gelfond and Wechsler stated: "We are pleased with our solid second quarter results, which reflect the ongoing success of our commercial strategy and the progress we are making executing our growth initiatives."

26. Additionally, and with respect the Company's potential sale or merger, the Company reported that while it received significant initial interest from multiple parties, the Company's view was that there were at that time no buyers who had indicated a willingness to

acquire the Company at a valuation sought by the Board of Directors. Because interest remained from several parties at a lower valuation, however, the Company stated that its Board had authorized the Company's bankers to explore these opportunities, and that the process was ongoing. Commenting on the strategic alternative update, defendants Gelfond and Wechsler stated:

> While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters. We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders.

27. Also on August 9, 2006, IMAX filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Joyce and reaffirmed the Company's previously announced financial results. Additionally, and with respect to the presentation of its financial results, the Company stated: "In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations." The Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by the Individual Defendants substantially similar to the certifications contained in ¶ 24, *supra*.

28. The statements contained in ¶¶ 17-27 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that defendants improperly timed revenue recognition from theatres; (2) specifically, that the Company recognized revenue in the fourth quarter of 2005 from at least ten theatres before the theatres had opened; (3) that the Company sought to manipulate its financial results because it desired to attract entities interested in buying or merging with the Company; (4) that the Company's financial statements were materially inflated; (5) that the Company lacked adequate internal

controls; and (6) that the Company's financial statements were presented in violation of GAAP.

**The Truth Begins to Emerge**

29. On August 9, 2006, after the market closed, IMAX shocked investors when the Company announced that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Specifically, the Company stated:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.

30. On this news, shares of IMAX plummeted $3.90, or 40.5 percent, to close, on August 10, 2006, at $5.73 per share, on unusually heavy trading volume.

**IMAX'S VIOLATION OF GAAP RULES
IN ITS FINANCIAL STATEMENTS
FILED WITH THE SEC**

31. These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.

32. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

33. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a) The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b) The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1,

¶34);

(c) The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e) The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f) The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

(g) The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated. (FASB Statement of Concepts No. 2, ¶95).

34. The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the

common stock of IMAX between February 17, 2006 and August 9, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IMAX's common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IMAX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IMAX; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

41. The market for IMAX's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, IMAX's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired IMAX common stock relying upon the integrity of the market price of IMAX's common stock and market information relating to IMAX, and have been damaged thereby.

42. During the Class Period, defendants materially misled the investing public, thereby inflating the price of IMAX's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented

the truth about the Company, its business and operations, as alleged herein.

43. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about IMAX's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of IMAX and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

44. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45. During the Class Period, Plaintiff and the Class purchased the common stock of IMAX at artificially inflated prices and were damaged thereby. The price of IMAX common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

46. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding IMAX, their control over, and/or receipt and/or modification of IMAX's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IMAX, participated in the fraudulent scheme alleged herein.

47. As previously set forth, defendants were motivated to hide the true nature of IMAX's financial instability because such disclosure would have a material effect on the Company's pursuit of strategic alternatives, including the sale or merger of IMAX with a separate entity.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

48. At all relevant times, the market for IMAX common stock was an efficient market for the following reasons, among others:

a. IMAX stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, IMAX filed periodic public reports with the SEC and NASDAQ;

c. IMAX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

d. IMAX was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

49. As a result of the foregoing, the market for IMAX common stock promptly digested current information regarding IMAX from all publicly-available sources and reflected such information in IMAX's stock price. Under these circumstances, all purchasers of IMAX common stock during the Class Period suffered similar injury through their purchase of IMAX common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

50. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IMAX who knew that those statements were false

when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder against All Defendants**

51. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase IMAX common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

53. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for IMAX common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

54. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IMAX as specified herein.

55. These defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IMAX's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about IMAX and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of IMAX common stock during the Class Period.

56. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

57. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IMAX's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

58. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of IMAX common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of IMAX's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired IMAX common stock during the Class Period at artificially high prices and were damaged thereby.

59. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that IMAX was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their IMAX common stock, or, if

they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

60. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act against the Individual Defendants**

62. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63. The Individual Defendants acted as controlling persons of IMAX within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65. As set forth above, IMAX and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 16, 2006

Respectfully submitted,

**BRODSKY & SMITH, LLC**

By:*/s/ Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES3254)
240 Mineola Boulevard
Mineola, NY 11501
Telephone: (516) 741-4977
Facsimile: (516) 741-0626

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Alison K. Clark
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706

**Attorneys for Plaintiff**